O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JEFFREY S.,

           Plaintiff,

  v.

ANDREW M. SAUL, Commissioner
of Social Security,[1]

           Defendant.

Case No. 2:18-cv-08538-KES

MEMORANDUM OPINION AND
ORDER

## I.

## BACKGROUND

Plaintiff Jeffrey S. ("Plaintiff") worked for six years as a loan officer for
AmeriSave Mortgage Corporation based in Atlanta, Georgia. Administrative
Record ("AR") 119, 603. He worked out of his home in California, sitting in a
kitchen chair and using his own telephone and computer to call leads, explain loan
terms, enter data, and originate loans. AR 119-20, 122, 431, 603, 607. In 2009

---

[1] Mr. Saul was sworn in as Commissioner of Social Security in June 2019.
See https://blog.ssa.gov/social-security-welcomes-its-new-commissioner/.
Accordingly, he is substituted for Ms. Berryhill pursuant to Federal Rule of Civil
Procedure 25(d).

and 2010, he reported more than $100,000 in annual income.  AR 313.  He developed neck and back pain and quit in July 2011 due to "excruciating pain."  AR 431, 603, 607.  Three years later in June 2014, he filed a workers' compensation claim against AmeriSave.  AR 602.  After some medical treatment, he received a settlement for $17,000 in approximately 2015.  AR 122.

In June 2015, he applied for Title II and Title XVI social security disability benefits, alleging disability commencing December 31, 2013.  AR 302-07.  On February 15, 2018, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by an attorney, appeared and testified, as did a vocational expert ("VE").  AR 113-33.  On April 4, 2018, the ALJ issued an unfavorable decision.  AR 65-83.

The ALJ found that Plaintiff suffered from several severe medically determinable impairments that cause back and neck pain, as follows: "cervical spine degenerative disc disease; history of cervical spine sprain/strain with spondylosis of the cervicothoracic region and cervicalgia; and lumbar spine degenerative disc disease; and lumbar spine sprain/strain."  AR 70.  The ALJ found that Plaintiff's depression, anxiety, and insomnia were non-severe.  AR 71.

Despite these impairments, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform medium work with some additional restrictions.  AR 72.  Of relevance here, the ALJ found that Plaintiff could stand, walk, or sit for 6 hours during an 8-hour workday.  Id.

Based on the RFC analysis and the VE's testimony, the ALJ found that Plaintiff could perform his past relevant work as a loan advisor (Dictionary of Occupational Titles ["DOT"] 249.362-018) or telephone solicitor (DOT 299.357-014), both of which are classified as sedentary jobs.  AR 76. The ALJ concluded that Plaintiff was not disabled.  AR 77.

## II.

### ISSUES PRESENTED

Issue One: Whether the ALJ erred by giving no weight to the opinion of Plaintiff's treating orthopedist in 2014 and 2015, Dr. David Johnson, that Plaintiff should be restricted from sitting or standing for more than "3 hours at a time per day" (AR 636).

Issue Two: Whether the ALJ erred by finding Plaintiff's mental impairments non-severe.

Issue Three: Whether the ALJ erred in evaluating Plaintiff's subjective symptom testimony.

(Dkt. 21, Joint Stipulation ["JS"] at 2.)

## III.

### DISCUSSION

A. **ISSUE ONE: Dr. Johnson.**

   **1. Summary of Relevant Medical Evidence.**

In June 2014, Plaintiff attended an initial evaluation with Dr. Johnson as part of his workers' compensation claim. AR 430, 602. He described his neck and back pain as having a gradual onset from 2006 to 2011 and reaching a 7/10 level by 2014. AR 354, 431. Plaintiff was taking aspirin for pain management, and he reported that medication helped alleviate his pain. AR 432. Dr. Johnson observed that Plaintiff had a normal range of motion ("ROM") in his cervical spine but a somewhat reduced ROM in his lumbar spine. AR 433-34. His legs had 4/5 motor strength. AR 434. Dr. Johnson diagnosed Plaintiff as suffering from cervical and lumbar spine sprain/strain and radiculopathy, injuries that were "sustained while in the course and scope of his employment" before he quit in July 2011. AR 435. Plaintiff was referred for additional tests, physical therapy, acupuncture, shockwave therapy, and chiropractic treatment; he was also prescribed various creams and patches as pain medication. AR 435-36.

Dr. Johnson evaluated Plaintiff again one month later in July 2014. AR 443.
Plaintiff still reported his pain as 7/10 and the ROM of his cervical spine had
slightly decreased, but he "denied any problems with the medications." AR 444-
45. Dr. Johnson opined that Plaintiff could return to work immediately if his
employer could accommodate a restriction against "prolonged standing, sitting, or
walking" and other limitations. AR 449.

Dr. Johnson continued to see Plaintiff approximately monthly. See AR 451
(August 2014); AR 458 (September 2014); AR 460 (October 2014); AR 466
(December 2014); AR 471 (January 2015); AR 477 (February 2015); AR 483
(March 2015); AR 489 (April 2015); AR 495 (May 2015); AR 501 (July 2015). At
all of these appointments, Plaintiff's ROM and motor strength stayed about the
same. He reported that the medications provided "temporary relief" and helped
him sleep. He consistently denied medication side effects.[2] Most significantly,
over this one-year period, Plaintiff's reported pain level dropped from 7/10 (AR
444) to 6/10 (AR 460), 5/10 (AR 477), 4/10 (AR 489), and finally to 3/10 (AR
501). Even on July 8, 2015, however, when Plaintiff's neck and back pain were
3/10, Dr. Johnson instructed him to remain off work. AR 501, 506.

About two weeks later on July 28, 2015, Dr. Johnson wrote the following
opinion letter:

> It is my medical opinion that [Plaintiff] be restricted from sitting and
> or standing for more than 3 hours at a time per day due to disc
> herniations … in his neck … and lower back … as a provision of
> medical treatment. Failure to provide such restriction would at least
> impede [Plaintiff's] recovery process, if not put him in risk of

---

[2] Compare, in July 2015, he told the Social Security Administration that his
medications caused "grogginess every morning and some dizziness." AR 354. In
late 2015, he described his medication side effects as "unknown." AR 362.

deterioration of his medical condition.

AR 636.

Also in July 2015, Plaintiff completed a patient history questionnaire (AR 602) and pain questionnaire (AR 353). He described having "shooting pain" every day, migraine headaches twice a week, and pain 51-75% of the time. AR 604. He checked boxes indicating that his condition affected his ability to sit and engage in postural activities, but he did not indicate impaired standing or walking. AR 605. He reported taking aspirin and Naprosyn (the brand name of naproxen) for pain. AR 606; see also AR 353 (he was taking 3 Advils/day and over-the-counter sleeping pills, a regimen he had followed for 8 years). During 2014 and 2015, it does not appear that Plaintiff was prescribed narcotic pain medication. See AR 643 (list of prescriptions filled at CVS from 6/11/14 through 6/10/16 includes no prescription pain medication); AR 644-47 (list of prescriptions filled at Rite Aid from 1/12/15 through 6/10/16 includes only one pain medication: ibuprofen prescribed by emergency room physician Dr. Vandordaklou in October 2015).

Plaintiff did not see Dr. Johnson again after July 2015. On October 7, 2015, Plaintiff saw Dr. Edwin Mirzabeigi through the workers' compensation system for an "initial" evaluation. AR 703. Plaintiff still rated his neck and back pain as only 3/10, consistent with his last reports to Dr. Johnson in July 2015. AR 705.

On October 22, 2015, the Social Security Administration denied his application for benefits. AR 198.

On October 27, 2015, at 8 a.m., Plaintiff visited the Long Beach Memorial Hospital emergency room ("ER") complaining of back pain. AR 799. He left against medical advice at about 8:15 a.m., saying that he wanted to find a hospital that would "given him an epidural shot." AR 801.

On the morning of October 28, 2015, Plaintiff returned to the ER. AR 661, 803. He reported that his treatment from Dr. Johnson, including "patches/ointments," provided him "minimal relief." AR 805. Results of a

straight-leg raising test, however, were negative.  AR 662, 807.  He received
prescriptions for Motrin and Valium, and Dr. Vandordaklou authorized a Toradol
injection.  AR 653-55.  Prior to those prescriptions, Plaintiff's pain medications
were Tylenol and aspirin.  Id.  Plaintiff exhibited "mild improvement after
medication" and was discharged to follow up with his primary care doctor.  AR
663.

Less than two weeks later on November 11, 2015, Plaintiff saw Dr.
Mirzabeigi again.  AR 696.  Plaintiff rated his neck and back pain as 3/10.  Id.  Yet
two days later on November 13, 2015, Plaintiff returned to the ER requesting
another Toradol injection.  AR 812.  He was "given Toradol with relief."  AR 815.

About one month later on December 11, 2015, Plaintiff saw Dr. Mirzabeigi
for a third time.  AR 680.  This time, Plaintiff rated his neck pain as 9/10 and his
back pain as 7/10.  Id.  The results of his physical examination did not change
significantly, and nothing in the progress note comments on or attempts to explain
the significant increase in reported pain.

A few days later on December 14, 2015, Plaintiff returned to the ER
complaining of neck and right ear pain.  AR 749.  His prescriptions at that time
included Tylenol, aspirin, ibuprofen, and Valium.  AR 750.  He requested another
injection like the one he received during his last ER visit and again had "pain relief
with Toradol."  AR 751.

Plaintiff returned to the ER in January 2016.  AR 759.  This time he was
prescribed Norco, Flexeril, and ibuprofen.  AR 762.  He visited the ER again in
March 2016 complaining of lower back pain "not relieved with ibuprofen."  AR
920.  "He was requesting toradol which has helped him in the past so toradol …
was ordered…."  AR 923.

In May 2016, Plaintiff went to an urgent care facility complaining of back
pain, neck pain, and headaches.  AR 916, 933.  He told them that he "need toradol
shots every month to help him with his pain."  AR 917.  He also reported that his

primary care doctor, Dr. Meka at Amistad Medical Clinic, had referred him to pain management, "but when he went, he saw too many people there and left."[3] AR 354, 917.

In July 2016, Plaintiff saw Dr. Elkhoury for an initial pain care evaluation. AR 952. Plaintiff described his spine and neck pain as 8/10. Id. He was directed to start "an active home exercise program." Id. Plaintiff reported that the pain relief associated with his medications was "clinically significant." AR 953.

In October 2017, Plaintiff described his pain medication regimen as "extra-strength Excedrin for neck and back pain and migraines, along with Advil as well as prescribed medications and shots at Long Beach Memorial Medical Center for severe neck/back pain." AR 412.

In December 2017, Plaintiff visited the ER complaining of ear pain following a cold. AR 33. A physical examination revealed a normal range of neck motion, normal range of back motion with some tenderness, and normal motor strength in his legs. AR 35.

In January 2018, he went to the ER complaining of chronic pain at level 8/10 and requesting another Toradol injection. AR 58-59, 61. He told the ER he was taking Motrin at home. AR 59. On February 8, 2018 (i.e., just a few days before the ALJ hearing on February 15), Plaintiff went to Kaiser for physical therapy. AR 1000. He told Kaiser that he "currently has a gym membership" and wanted to know what exercises to do at the gym. Id.

On February 27, 2018, he was scheduled to have another steroid injection in his back, but the procedure was canceled when the Kaiser doctors did not receive ordered MRIs in advance. AR 1015.

---

[3] There are no records in the AR from Amistad Medical Clinic. Pharmacy records identify the prescriber as "Meena K. Meka." AR 651. Records from Long Beach Memorial Health System identify "Ajay G. Meka" as Plaintiff's primary care doctor. AR 899.

In April and May 2018, Plaintiff went to the ER for Toradol shots. AR 20-21, 30. In May, the hospital staff indicated that he could return to work the next day. AR 23.

## 2. The ALJ's Assessment of Dr. Johnson's July 2015 Opinion.

The ALJ wrote, "Dr. Johnson's opinion that the claimant should be restricted from sitting and standing more than three hours at a time per day due to disc herniation, is again inconsistent with the claimant's report of his own activities of daily living. It is inconsistent with the medical evidence of record as a whole (Ex. 10F [Dr. Johnson's opinion letter at AR 636])." AR 75-76. The ALJ discredited Dr. Johnson's opinion that Plaintiff should remain off work in 2015 as "inconsistent with the claimant's conservative treatment measures" and with "claimant's workout routine of lifting weights and walking an hour on the treadmill." AR 75.

## 3. Analysis of Claimed Error.

Plaintiff argues that the ALJ's three reasons lack substantial evidentiary support. Plaintiff argues that Dr. Johnson's opinion is not inconsistent with the medical evidence, citing three cervical and three lumbar MRI studies showing various effects of degenerative disc disease. (JS at 3, citing AR 738-43 [C-spine 06/19/2014]; AR 730-33 [C-spine 01/07/2015]; AR 716-19 [C-spine 07/29/15]; AR 744-47 [L-spine 06/19/2014]; AR 713-15 [L-spine 07/29/2015]; AR 734-37 [L-spine 01/07/2019].) Plaintiff argues that he has not received conservative treatment, citing the Toradol injections. (JS at 9.) Finally, Plaintiff argues that Dr. Johnson's opinion is not inconsistent with his workout routine, because he can lift light weights and walk on a treadmill without sitting or standing for more than three hours. (JS at 6.)

Dr. Johnson's treating notes from June 2014 to July 2015 show steady improvement in Plaintiff's pain levels. AR 431, 444, 460, 477, 489, 501. Just days before Dr. Johnson wrote the disputed July 2015 opinion letter, Plaintiff rated

his neck and back pain as only 3/10, and he still rated his pain at 3/10 in November 2015. AR 501, 705, 696. These records support the ALJ's finding of inconsistency with the medical evidence. Indeed, all three of the cervical MRIs and two of the lumbar MRIs were done before July 29, 2015 (i.e., about the time Dr. Johnson wrote his opinion letter and stopped treating Plaintiff). Regardless of what physical abnormalities these MRIs show, they correspond in time with Plaintiff's reports that his neck and back pain had improved from 7/10 to 3/10 and stayed at 3/10 from July 2015 to November 2015.

Dr. Johnson's treating notes also describe conservative treatment, such as acupuncture and patches and ointments for pain relief. AR 435-36. While Plaintiff later requested more aggressive treatment from ER doctors in the form of Toradol injections, the ALJ did not error in citing the inconsistency between Dr. Johnson's conservative treatment recommendations and his opinion of Plaintiff's functional limitations.

Regarding the third reason, Plaintiff testified in 2018 that he went to the gym "a lot." AR 118. He walked to a gym located less than a quarter mile from his friend's house where he lived. AR 124. At the gym, he walked on the treadmill "no more than an hour or two hours" at a time. AR 121. He described walking "about a mile a day" on the treadmill. AR 366. He also lifted "very light weights … maybe 10 or 15 pounds dumbbells on each hand." AR 123. He testified that he could lift "maybe 15 to 20 pounds max." AR 122. The ALJ could rationally have construed this testimony about walking to the gym, walking up to two hours on the treadmill, lifting weights, and walking home, as inconsistent with a medical opinion prohibiting Plaintiff from standing for more than three hours.

Finally, any error in addressing Dr. Johnson's opinion appears harmless. Dr. Johnson opined that Plaintiff was restricted against sitting or standing "for more than 3 hours *at a time* per day." AR 636 (emphasis added). Dr. Johnson offered no opinion concerning how much total time Plaintiff could spend standing or

walking during an 8-hour workday. Plaintiff, who still bears the burden of proof at step four of the sequential evaluation process, has not cited any evidence suggesting that he could not perform his past relevant work by alternating between sitting and standing and taking normal breaks. His primary duties of using a computer and talking on the phone can be done either sitting or standing using common equipment such as a cordless or cellular telephone and a higher and lower surface for a laptop computer, such as a counter and a table or an adjustable workstation.

B. **ISSUE TWO: Plaintiff's Mental Impairments.**

      1. Summary of Mental Impairment Evidence.

In June 2015, Plaintiff did not identify mental illness as a basis for his application for disability benefits. AR 134, 339. In a July 10, 2015 workers' compensation history form, Plaintiff indicated that he was not suffering from any mental illness. AR 606.

A few days later on July 31, 2015, chiropractor Harold Iseke recommended that Plaintiff use workers' compensation insurance benefits for a psychiatric consultation due to pain-related stress. AR 594, 628 (referral to psychologist Grewal). On August 6, 2015, Plaintiff visited therapist Enrico Balcos at Harbor Psychologist. AR 615-17. He told Dr. Balcos that he was employed at a loan office and lived alone.[4] AR 618. Dr. Balcos diagnosed him as suffering from major depression. AR 619. This is the only treating record from Dr. Balcos.

On August 24, 2015 (per a fax timestamp), Plaintiff wrote a note memorializing that he was experiencing anxiety and extreme depression. AR 614. He wrote that he had been diagnosed with attention deficit hyperactivity disorder

---

[4] Compare, Plaintiff testified that he has not worked since leaving AmeriSave in 2011. AR 119. He tried to return to working 3 times in 2014, but each attempt lasted no more than one month. AR 331. He has lived with his friend R. H. since at least July 2015. AR 602, 610.

("ADHD") by psychologist Dr. Benjamin Stepanoff while psychiatrist Dr. Kenneth Abjelina had diagnosed him with anxiety and depression.  Id.  Both of these medical sources work for the Advances in Mental Health and Addictions Treatment Center, per their business cards.  Id.  In September 2015, Dr. Stepanoff wrote a letter that says nothing about ADHD, but instead states that he was treating Plaintiff for bipolar disorder while Dr. Abjelina was providing medication support. AR 638; see also AR 652 (on 10/12/15, Dr. Abjelina prescribed bupropion, the generic name for Wellbutrin, an antidepressant).

In October 2015, Plaintiff underwent a psychiatric evaluation at CNS Network (medical source's name illegible).  AR 631.  At the time, he was taking Wellbutrin and Paxil.  Id.  The diagnostic impression was major depressive disorder.  AR 632.  In November 2015, Dr. Meena Meka prescribed Trazadone, an antidepressant.  AR 645.

On December 14, 2015, ER staff observed that Plaintiff was "negative for depression."  AR 750.  On January 6, 2016, Plaintiff reported to the SSA he was taking Wellbutrin for depression.  AR 368.  On January 11, 2016, however, Plaintiff denied depression to ER staff.  AR 760.  They observed that his "speech, mood and behavior" were "appropriate."  AR 761.  In March 2016, he again denied depression at the ER.  AR 921.

In May 2016, Plaintiff went to an urgent care facility complaining of back pain, neck pain, and headaches.  AR 916.  Staff observed that he "seemed anxious" and "slightly manic."  AR 917.

On June 28, 2016, Plaintiff had an appointment with Dr. Sandoval at Progeny Psychiatric Group.  AR 951.  He was diagnosed as suffering from depression, anxiety, and insomnia.  Id.  There are no other treating records from Dr. Sandoval in the AR.  As of June 2016, however, Dr. Meka had prescribed bupropion and Dr. Annabel Walker had prescribed hydroxyzine, a medication used to treat anxiety.  AR 643.

In July 2016, Plaintiff underwent a cognitive assessment as part of pain management. AR 952. The assessment "revealed no abnormal findings. [Plaintiff's] affect was appropriate. The patient's mood was cooperative and pleasant throughout our session. He was alert and oriented ...." AR 955.

In December 2017, the ER staff assessed, "Psychiatric exam normal." AR 35. Plaintiff again denied anxiety and depression. AR 36.

At the hearing in February 2018, when asked why he could not work, Plaintiff testified that in addition to his neck and back pain, he cannot focus or concentrate; he has severe depression, anxiety, and migraine headaches 5 or 6 times a week. AR 120, 125-27. He testified that he had received a prescription for bipolar medication, but it made him nauseous. AR 128.

On February 24, 2018 (just 9 days after the February 15 hearing), Plaintiff told the Kaiser ER he had attempted suicide the night before by taking 8 over-the-counter antihistamine pills; he told one person at Kaiser that he took the pills because he could not bear his chronic neck and back pain anymore, but he told another person that he took the pills because he felt "worthless" and "useless." AR 44-45, 53-54, 1010. Plaintiff told the ER staff that "there has been no change in [his] symptoms over time; are constant." AR 48. He also reported that he was "independent with ADLS [activities of daily living]."[5] AR 53. He had a normal ROM in his neck, back, and lower extremities. AR 48. After receiving a Toradol injection and other treatment, he told ER staff that he was feeling better and wanted to leave "to go to the gym, use the treadmill and watch sports on TV." AR 54-55. The ER determined he was not a danger to self or others. AR 1011. He was transported to Kaiser's psychiatric ward where, according to Plaintiff, he

---

[5] Compare, he told the Social Security Administration that he had "marked restrictions in personal care and activities of daily life." AR 375.

1    stayed for three days before discharge.  AR 282.[6]

2         The state agency medical consultants both opined that Plaintiff's mental

3    impairments were non-severe.  AR 142, 173-74.

4              2.   Special Technique for Evaluating Mental Impairments.

5         To determine the severity of mental impairments at step two in the

6    sequential evaluation process, the ALJ must consider how well the claimant

7    functions in four areas: (1) understanding, remembering, or applying information;

8    (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and

9    (4) adapting or managing oneself.  20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

10   A claimant with only "none" or "mild" limitations in these areas does not have a

11   severe mental impairment.  20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

12        The regulations require that ALJs document their application of this special

13   technique in certain ways.  20 C.F.R. §§ 404.1520a(e), 416.920a(e).  Specifically,

14   "the written decision must incorporate the pertinent findings and conclusions based

15   on the technique.  The decision must show the significant history, including

16   examination and laboratory findings, and the functional limitations that were

17   considered in reaching a conclusion about the severity of the mental impairment(s).

18   The decision must include a specific finding as to the degree of limitation in each

19   of the functional areas described in paragraph (c) of this section."  20 C.F.R.

20   §§ 404.1520a(e)(4), 416.920a(e)(4).

21             3.   The ALJ's Application of the Special Technique.

22        The ALJ addressed each of the four functional areas finding that Plaintiff

23   had no limitation in the areas of understanding, remembering, or applying

24   information and interacting with others.  AR 71.  The ALJ found him mildly

25   limited in the areas of adapting/managing himself and maintaining concentration,

26   _____

27        [6] The Court has not found any records in the AR to support Plaintiff's claim
     that he was in the psychiatric ward for several days.

28

                                              13

persistence, or pace.  Id.

As supporting evidence, the ALJ cited Plaintiff's testimony that he deals with headaches by going to the gym (citing AR 126) and that he repeatedly denied depression during examinations at the ER (citing AR 879).  AR 71.  The ALJ also noted that Plaintiff had undergone several mental health examinations in which the findings were "normal overall" (citing AR 855 [" mood and affect normal"] and AR 918 [" mood and affect normal.  …  Normal personal interaction during the interview.  Exhibits good judgment."]).  AR 71.  As evidence of Plaintiff's unimpaired cognitive functioning, the ALJ cited the fact that he could drive and ride the train independently.  Id.  As evidence of his social skills, the ALJ cited the fact that he had lived with a roommate for many years.  Id.; AR 27 (Plaintiff could ask his roommate R. H. for help).  As evidence of his self-management skills, the ALJ cited his ability to care for his personal needs independently and visit the gym regularly.  Id.

4.   Analysis of Claimed Error.

Plaintiff argues that the ALJ committed legal error by failing to discuss two mental status examinations with slightly abnormal findings at AR 618-19 and 632. (JS at 10.)  Specifically, in August 2015 during his one and only appointment with Dr. Balcos, Dr. Balcos noted an "appropriate" appearance, "cooperative" attitude, an "organized/intact" thought process with "soft" speech and "anxious" mood.  AR 618.  Dr. Balcos noted "mildly" impaired concentration and judgment with "good" insight and unimpaired self-perception.  AR 619.  In October 2015, an unidentified medical source at CNS Network noted "depressed" mood, "average" intellect, "appropriate" vocabulary, "fair" memory, and "fair" judgment.  AR 632.

First, Plaintiff cites no legal authority for the premise that an ALJ must discuss every piece of mental health evidence when applying the special technique at step two of the sequential evaluation process.  Here, the ALJ complied with the procedural requirements imposed by the regulations by making findings in all four

14

1  functional areas and citing supporting evidence.  AR 71.

2       To the extent Plaintiff contends that the ALJ erred by failing to give reasons

3  for rejecting these two mental status examinations, the ALJ did not reject them.

4  The ALJ agreed with their content, finding that Plaintiff suffers from depression

5  and anxiety as medically determinable impairments that caused some mild

6  functional impairment.  Id.

7       The cited records do not demonstrate that the ALJ's findings for any of the

8  four functional areas lack substantial evidentiary support.  To the contrary, they are

9  consistent with the ALJ's findings of only mild limitations in the area of

10  concentration and self-management with no limitations affecting cognition or

11  social interactions.  AR 71.  Plaintiff has failed to demonstrate that the ALJ

12  committed legal error by finding his mental impairments non-severe.

13       To the extent Plaintiff claims that the ALJ erred by adopting an RFC that

14  fails to accommodate the mild functional impairments caused by his mental illness,

15  Plaintiff failed to develop this argument by identifying any required

16  accommodation(s) and citing supporting medical evidence.  As a result, he failed

17  to carry his burden of demonstrating legal error.

18  C. **ISSUE THREE: Plaintiff's Subjective Symptom Testimony.**

19    **1.  Rules for Evaluating Subjective Symptom Testimony.**

20       An ALJ's assessment of symptom severity and claimant credibility is

21  entitled to "great weight."  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989)

22  (quoting Green v. Heckler, 803 F.2d 528, 532 (9th Cir. 1986)).  "[T]he ALJ is 'not

23  required to believe every allegation of disabling pain, or else disability benefits

24  would be available for the asking, a result plainly contrary to 42 U.S.C.

25  § 423(d)(5)(A).'"  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting

26  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

27       If the ALJ finds testimony as to the severity of a claimant's pain and

28  impairments is unreliable, the ALJ must evaluate subjective symptom testimony

"with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). In doing so, the ALJ may consider testimony from physicians "concerning the nature, severity, and effect of the symptoms of which [the claimant] complains." Id. at 959. If the ALJ's finding is supported by substantial evidence in the record, courts may not engage in second-guessing. Id.

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. Lingenfelter, 504 F.3d at 1035-36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036. If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

**2. The ALJ's Reasons for Discrediting Plaintiff's Testimony.**

The ALJ gave at least four reasons for discrediting Plaintiff's testimony concerning the intensity, persistence, and limiting effects of his pain: (1) his testimony lacked objective medical support; (2) Plaintiff engaged in activities inconsistent with his claimed degree of limitation, (3) Plaintiff received conservative treatment, which improved his symptoms; and (4) Plaintiff made inconsistent statements about his limitations. AR 71, 73, 75. As explained below,

these are clear and convincing reasons supported by substantial evidence.

a. <u>Reason One</u>: Lack of Objective Evidence.

"Although lack of medical evidence cannot form the sole basis for discounting pain testimony," ALJs may consider that factor in their analysis. <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005).

As discussed above, Dr. Johnson's treating records reflect steady improvement of Plaintiff's pain level from 7/10 to 3/10 between June 2014 and July 2015 with conservative treatment. AR 74 (ALJ cited Dr. Johnson's records as inconsistent with Plaintiff's claimed degree of impairment). In later years of his claimed period of disability, ER staff observed a normal ROM in his neck and back, no impaired motor strength, and negative straight-leg raising tests. AR 35, 662. This is inconsistent with Plaintiff's claims of constant, disabling pain and his testimony that he stopped driving, in part, because of trouble turning his neck. AR 124, 353.

While Plaintiff testified that he suffers from bipolar disease (AR 127, 284), the ALJ noted, "His treatment of bipolar disorder has been minimal and could not be medically determinable with the evidence provided." AR 71. The AR contains a letter from psychologist Dr. Stepanoff stating that he treated Plaintiff for bipolar disorder, but there are no treating records. AR 638. The ALJ gave Dr. Stepanoff's opinion "no weight" because "there was no evidence of ongoing mental health treatment consistent" with an opinion of complete disability. AR 72. The ALJ did not err in finding a lack of medical evidence to support Plaintiff's claim that he is so "mentally sick" with bipolar disease, severe depression, and anxiety that he "absolutely cannot function as a normal human being." AR 284.

b. <u>Reason Two</u>: Inconsistency with Activities.

In January 2016, Plaintiff completed an exertion questionnaire. AR 366. He reported that he was homeless, but a friend living on Eucalyptus Avenue in Long Beach let him sleep on the couch; sometimes he slept in his car. AR 366, 384. At

that time, he tried "to walk about a mile a day on the treadmill," but he could not do "any bending or weight lifting." AR 366. He added a handwritten note saying, "3 doctors notes state I cannot sit or stand more than 2 [hours]." AR at 368.

At the hearing in February 2018, Plaintiff testified that he still lived with his friend on Eucalyptus Avenue and was "sleeping on the couch." AR 117. He had a driver's license, but he opted to "take the train everywhere" because his car had been nonoperational for approximately three years and because he had "trouble turning his neck" and "unbelievable anxiety" in traffic.[7] AR 118, 124. He testified that a typical day involved going to the gym, using the treadmill, and lifting weights. AR 118, 123. "Once in a blue moon" he would go to the beach, taking the train from Long Beach to Santa Monica. AR 118, 122. He also sometimes went to Denny's restaurant and a church called Agape. AR 27. He could use a cellphone, ride in a taxi, and buy meals at fast food restaurants. AR 54, 62, 367.

The ALJ did not commit legal error in concluding that these substantial daily activities were inconsistent with Plaintiff's claim of total disability and "continual shooting pains," "everyday shooting pains continually during each day," "constant discomfort," alleged inability to "pick[] items up" without assistance, constant 9 out of 10 pain, complete lack of "motivation or energy to do normal daily functions," loss of "all ability to focus or concentrate," and inability "to function as a normal human being." AR 283-84, 353, 355.

c. <u>Reason Three</u>: Conservative Treatment and Improvement.

While the parties dispute in the briefing whether certain treatment is, or is not, conservative, the real issue is whether the recommended treatment was more conservative than one would expect given the level of Plaintiff's claimed

---

[7] He was still driving in July 2015 (AR 354-55) and driving to medical appointments in March 2016. AR 920. In late December 2017—i.e., about two months before the hearing—ER staff noted, "Driving self, unaccompanied." AR 37.

functional limitations and the nature of his underlying impairments. See Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (noting that evidence of conservative treatment "is sufficient to discount a claimant's testimony regarding severity of an impairment"); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) ("[T]he ALJ [appropriately] noted the absence of medical treatment for claimant's back problem . . . suggesting that if the claimant had actually been suffering from the debilitating pain she claimed she had, she would have sought medical treatment during that time.").

As discussed above, Plaintiff's pain improved significantly in 2014 and 2015 under the conservative care of Dr. Johnson. During much of the period of claimed disability, Plaintiff was not taking any narcotic pain medication and minimal prescription pain medication. While Plaintiff started going to the ER to request Toradol shots after the initial denial of his application for disability benefits, no primary treating doctor recommended that course of treatment, and the various ER doctors and nurses who authorized the shots did not observe any significant functional limitations. Neither party cites any surgical consultations or recommendations for surgery in the AR, and Plaintiff's degenerative disc disease is a condition sometimes amenable to surgical intervention. The ALJ did not err in concluding that this course of treatment was more conservative than one would expect for a person suffering from disabling back and neck pain.

d. Reason Four: Inconsistent Statements.

The ALJ asserted that Plaintiff made inconsistent statements by claiming that "he could never lift over 10 pounds" while admitting that he went to the gym to lift weights. AR 76. The ALJ did not cite to where Plaintiff said he could never lift more than 10 pounds. The ALJ may have intended to reference AR 609, but that questionnaire asked Plaintiff to describe the lifting requirements of his work pre-injury, and he checked "occasionally" up to 3 hours of lifting up to 10 pounds and "never" more than 10 pounds. At the hearing, Plaintiff testified that he lifted

19

"10 or 15 pound dumbbells" with each hand. AR 123. In an earlier questionnaire, he stated that he could not do any weightlifting, but he also stated that he could lift "less than 20 pounds," which is consistent with his hearing testimony. AR 367. Plaintiff does not appear to have made materially inconsistent statements about his lifting abilities.

The ALJ also cited Plaintiff's testimony about his sitting and standing abilities as inconsistent with his regular gym workout. AR 76. Plaintiff reported that he experienced pain "anytime [he would] sit or stand more than approx. 2 hours." AR 353. In the same questionnaire, he said, "Cannot sit or stand for more than a few hours." AR 355. He clarified that he could stand for no more than 1 hour and sit for no more than 2 hours at a time. Id. He also stated that he could only drive "maybe one hour or so," but he could not "sit or stand more than 2 hours." AR 367-68. At the hearing, he testified that he could sit for a "maximum [of] two hours or so" before needed to get up. AR 121. When asked about standing, he referenced the fact that he used the treadmill for one or two hours at a time. Id. He described walking to the gym and then walking "about a mile a day" on the treadmill. AR 124, 366. Elsewhere, he stated that he could only walk "a few blocks." AR 355.

Plaintiff's statements are roughly consistent with each other. As discussed above, Plaintiff's ability to walk to the gym, use the treadmill for up to 2 hours, lift weights, and then walk home demonstrated that he could stand or walk for more than 3 hours total in an 8-hour day, but Plaintiff appears to be describing his maximum exertional abilities without taking a break, making it difficult to assess whether his testimony is truly inconsistent with his gym routine.

The ALJ also noted that while Plaintiff testified that he suffers from "severe depression" (AR 127), he "repeatedly denied having depression during his physical examinations." AR 71. As summarized above, Plaintiff did repeatedly deny depression to ER staff in 2016 - 2018 (see AR 36, 750, 760, 921) at the same time

that he was telling the Social Security Administration he suffered from depression (see AR 127, 282, 614). He told the Social Security Administration that Dr. Meka was treating him for severe depression (AR 411), but there are no such treating records in the AR. Plaintiff also testified that he suffers from bipolar disease (AR 127, 284), but the ALJ found this inconsistent with the lack of treatment records. AR 71. The ALJ's findings that Plaintiff made inconsistent statements about his mental health are supported by substantial evidence and provide a fourth clear and convincing reason to discount Plaintiff's subjective symptom testimony.

## V.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.


DATED:  July 08, 2019

_Karen E. Scott_
_____
KAREN E. SCOTT
United States Magistrate Judge